UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
MARIA LOUIS

                             Plaintiff,

      - against -

THE METROPOLITAN TRANSIT
AUTHORITY, ET AL.,

                        Defendants.
-------------------------------------------------------x

**MEMORANDUM AND ORDER**
12-CV-6333 (ILG) (JO)

GLASSER, Senior United States District Judge:

      Plaintiff Maria Louis ("Louis") brought suit against the Metropolitan Transit

Authority Bus Company ("MTA") and its bus driver, Stephen Wright (collectively "MTA

Defendants"), as well as the City of New York ("City") and its police officer, Crystal

Martin (collectively "City Defendants"), under 42 U.S.C. § 1983, asserting claims based

on the First, Fourth, and Fourteenth Amendments. Plaintiff, a Muslim woman, claims

that she was ejected from a public bus because she was wearing a burqa. After discovery,

the MTA Defendants and City Defendants moved for summary judgment. Plaintiff

opposed the MTA Defendants' motion. For the following reasons, the City Defendants'

motion is GRANTED. The MTA Defendants' motion is DENIED in part and GRANTED

in part.[1]

---

[1] Plaintiff asserts claims against Wright and Martin in both their official and individual capacities. But official-capacity suits "represent only another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165–66 (1985) (quotation omitted). Accordingly, those claims are routinely dismissed as duplicative when the municipality is also a defendant. See, e.g., Thomas v. Venditto, 925 F. Supp. 2d 352, 364 (E.D.N.Y. 2013); Volpe v. Nassau Cnty., 915 F. Supp. 2d 284, 298 (E.D.N.Y. 2013). Because Plaintiff has also sued the MTA and the City, her claims against the individual defendants in their official capacities are dismissed.

# 1   <u>Factual Background</u>

## 1.1   May 26, 2012 Dispute

On the morning of May 26, 2012, Louis was a passenger on a Q110 bus in Queens. Louis Dep. at 68;[2] Wright Dep. at 33–34.[3] A devout Muslim, Louis was wearing a burqa (a veil that covers the entire body), a symbol of her religion. Louis Dep. at 19, 70. Louis testified that she was standing in the passenger area at the front of the bus, one seat's length behind Defendant Wright, the bus driver. <u>Id.</u> at 72–74, 76, 83.

Louis claims that during the ride, Wright called her "scary" and said "nobody can see her." Hrg. at 27; Dep. at 70–71, 81–82. She testified that, in response, she told Wright that she is a Muslim and has a right to practice her religion. Dep. at 82. She claims that Wright then stopped the bus and ordered her to leave. <u>Id.</u>; Hrg. at 27. Louis refused and called 911 to report discrimination. Louis Dep. at 83–85, 101.

Wright tells a different story. He claims the dispute began when he told Louis to step behind the white line at the front of the bus. Dep. at 42–43, 46. Wright swears that Louis was standing on the line, <u>id.</u> (which is unlawful[4])—but Louis denies that. Louis Dep. at 76–77. Wright, however, insists that Louis repeatedly refused to step back, became angry, and loudly accused him of discrimination. Dep. at 42–44, 46–48. Wright

---

[2] Louis twice testified under oath in relation to this action. First, on September 12, 2012, she testified at a hearing that was held under Section 1276 of New York Public Authorities Law. <u>See</u> Ferrier Decl., Ex. G, Dkt. No. 64-11 ("Hrg."). Second, she was deposed on December 10, 2013. <u>See</u> Ferrier Decl. Ex. B, Dkt. No. 64-6 ("Louis Dep" or, where context allows, "Dep.").

[3] Ferrier Decl., Ex. C, Dkt. No. 64-7 ("Wright Dep." or, where context allows, "Dep.").

[4] Ferrier Decl., ¶ 4 (citing 17 N.Y. CRR 720.4(C)(1)(f)).

testified that although he felt threatened by Louis' behavior, he did not respond. Id. at 47–48, 103–104. He simply got off the bus and called MTA dispatch. Id. at 47.[5]

There is a recording of Wright's call. At the start, Wright can be heard saying, "I don't know if she would stab me in the back." Audio: Call from Stephen Wright to MTA Bus Dispatch (May 26, 2012) ("Call Audio")[6]; accord Wright. Dep. at 105, 124. To the dispatcher, Wright says:

> I got a situation. . . . [A passenger] dressed head to toe . . . comes standing right up beside me. I was very uncomfortable because I don't know if it is a man; I don't know if it's a woman; I don't know what it is. So I just asked this person . . . [to] step to the back [or middle] of the bus or . . . [to] a seat on the bus. But [it got] right up on to me . . . and I can't tell what it is. . . So I stopped the bus. . . .

Call Audio.

In response, the dispatcher asks whether Wright stopped the bus because he could not determine a passenger's gender. Id.

Wright responds, "No. No. No. The person is right up beside me [and] the driver's seat. And that bus is empty . . . with seats everywhere . . . and [she] is dressed from head to toe . . . I can't distinguish nothing." Id.

The next few seconds of the call are inaudible. Id. In his deposition, Wright testified that he told the dispatcher that Louis was irate. Dep. at 49–50, 105. But he concedes that during the call he did not mention the white line. Id. at 49–50, 110–113. At the end, the dispatcher agrees to send a supervisor to assist Wright. See Call Audio.

---

[5] Wright, of course, denies being motivated by Louis' burqa or religion; although he knows that some Muslims (and Hindus) wear burqas, he claims he did not know that Louis was a Muslim. Id. at 107–108, 114.

[6] Ferrier Decl., Ex. I, Dkt. No. 64-13.

The police—Defendant Martin and her partner—responded to Louis' 911 call. They spoke to Louis first. Louis Dep. at 97–99; Wright Dep. at 57. Louis gave a statement and reported that she was a victim of discrimination. Louis Dep. at 98. When the police asked if she wanted to stay on the bus, Louis said yes. Id. According to Louis, during the exchange, one of the officers said, "I wish I could see [Louis'] face." Id. at 97.

The officers then spoke to Wright, outside the bus. Louis Dep. at 98–99; Wright Dep. at 59. Wright told them that because of Louis' reaction to his order to step back, he felt unsafe and wanted her off the bus. Id. at 60–61, 104–105. At the officers' request, Wright produced a free bus transfer pass for Louis. Id. at 62.

Louis, still on the bus, started to record a video. Louis Dep. at 99. The video shows Martin enter the bus and say "[Wright] wants you off the bus. . . . If he's not comfortable with you on the bus, he has every right to express so." Video: Maria Louis Cellphone Video (May 26, 2012). Martin gives Louis the transfer pass and tells her to leave. Id. Louis grudgingly complies, walking to a cab. Id.; see Louis Dep. at 99–100.[7]

Wright drove away before his supervisor arrived. Wright Dep. at 63–64.

## 1.2 Aftermath

A few days after May 26, 2012, Louis complained to the MTA by phone and in writing. Louis Dep. at 111, 137–40.[8] Several weeks later, on June 22, 2012, Louis filed a notice of claim against the MTA (amended July 27, 2012).[9] Ultimately, Wright was

---

[7] Martin's testimony does not add detail. During her deposition, she could not remember anything about the dispute or her response. See, e.g., Martin Dep. at 33:6–8 (Ferrier Decl., Ex. H, Dkt. No. 64-12).

[8] See Brewington Decl., Ex. W, X & Y, Dkt. No. 70-5.

[9] Brewington Decl., Ex. O & P, Dkt. No. 70-5.

reprimanded by the MTA for leaving the scene on May 26, 2012 before his supervisor arrived. Wright Dep. at 19–20, 23, 64.

Louis claims that after May 26, 2012, she stopped riding the Q110 bus, and approximately one year later, in May or June 2013, moved to Philadelphia. She testified that she did not feel safe in New York and that the place to which she was moving has a larger Muslim population. Dep. at 12–13, 15; Hrg. at 69–70.

As for physical, mental, emotional, and other injuries, Louis claims to have suffered trauma, which caused headaches, high blood pressure, depression, anxiety, and weight loss. She testified that she can no longer read, write, or work, among other things. Dep. at 30, 153–54; Hrg. at 5–8, 30–31, 50–51, 64.

### 1.3   MTA Policies

Although there is some evidence of the MTA's policies regarding training and driver authority, the facts are incomplete.

Wright testified that when he started working for the MTA in 2003, he was trained in customer relations. Wright Dep. at 9.

The record contains excerpts from the MTA Department of Buses Rules and Regulations ("Rules")[10] and Student Bus Operator Instruction Manual ("Manual").[11] The Rules require, among other things, drivers to "treat all customers . . . with courtesy, avoid argument and exercise patience, forbearance and self-control," and "be attentive without being offensive." Rule 10(c). They prohibit drivers from using "loud, uncivil, indecent, or profane language even under the greatest provocation." Rule 10(d).

---

[10] Brewington Decl., Ex. T, Dkt. No. 70-5.

[11] Brewington Decl., Ex. U, Dkt. No. 70-5.

The Rule governing ejectment states:

(a) In case of ejectment of a customer, no more force must be used than is necessary to remove the customer from the car, bus, or System property. No blows must be struck nor weapons used by employees, unless absolutely necessary for the defense of themselves or other persons, and under all circumstances care must be taken for the safety of customers. When the customer voluntarily leaves . . . or shows willingness to do so, no hand must be laid on such person except to give needed assistance.

(b) When an ejectment or arrest is made, a full report must be made as in accident cases. Equal care must be taken to obtain names and addresses of witnesses, particularly the district/precinct number of the police officer, *if any*, assisting in an ejection or arrest.

Rule 31 (emphasis added).

The Manual states that before removing a bus from service, drivers must receive authorization from their dispatcher. Manual at 120. It also details procedures for reporting incidents. Id. at 152–55.

Martin's deposition testimony explains the role of police officers. Martin testified that she has not been trained in removing passengers; that she has discretion to remove passengers for safety reasons; and that she has never had to override a driver's decision to eject a passenger. Dep. at 25–26, 39–40, 42. She testified that passengers who do not comply with safety rules "do not have a right to remain on the bus," and that the bus driver "has that determination." Id. at 62. When there is a dispute, rather than "automatically ask the [passenger] to leave," Martin usually speaks to the passenger and driver and attempts to negotiate a resolution. Id. at 62–63. Martin claims that she does not necessarily side with the driver, and that she would not support ejecting a passenger who only wore a burqa or stood on the white line. Id. at 71–73. However, Martin testified that if a driver were to refuse to drive with a particular passenger, she would have no "choice but to ask [the passenger] to leave." Id. at 72.

## 1.4   Procedural History

Plaintiff commenced this action on December 26, 2012.[12] On March 19, 2015, the MTA Defendants and City Defendants moved for summary judgment. Dkt. Nos. 64–68. Plaintiff opposed only the MTA Defendants' motion. Dkt. No. 71.

## 2   **Legal Background**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010) (citations and quotation omitted). "A fact is material if it might affect the outcome of the suit under the governing law." Id. In deciding a motion for summary judgment, the court must "construe the facts in the light most favorable to the nonmoving party" and "resolve all ambiguities and draw all reasonable inferences against the movant." Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (quotation omitted). Where, as here, a non-moving party fails to respond, "the district court may not grant the motion without first

---

[12] The original and amended complaints (Dkt. Nos. 1, 27) name defendants who have not been served or identified, and who, consequently, are not part of this action. First, the original and amended complaints name an unidentified bus driver involved in an alleged April 3, 2012 incident on a Q1 bus, which is operated by the New York City Transit Authority (NYCTA). Second, the amended complaint asserts claims against the NYCTA and New York Police Department (NYPD). But these parties were never served. And, in any event, NYPD cannot be sued because it "is an organizational subdivision of the City of New York, lacking independent legal existence." Maier v. N.Y. City Police Dep't, No. 08-CV-5104, 2009 WL 2915211, at *2 (E.D.N.Y. Sept. 1, 2009); see also Burroughs v. Dorn, No. 13-CV-03609, 2013 WL 3820673, at *3 (E.D.N.Y. July 22, 2013). Third, Plaintiff agreed to discontinue the action against the Metropolitan Transit Authority (an entity related to Defendant MTA Bus Company—herein just "MTA"). See Dkt. Nos 10, 19. Thus, only the MTA, City, Wright, and Martin are defendants—and their involvement is limited to the May 26, 2012 incident.

7

examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004) (citation omitted).

Section 1983 creates a cause of action against "[e]very person who, under color of any [state] statute, ordinance, regulation, custom, or usage" deprives another of "rights, privileges, or immunities secured by the Constitution and laws. . . ." 42 U.S.C. § 1983. The statute "itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993), cert. denied, 512 U.S. 1240 (1994) (citing City of Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985)). To prove a Section 1983 claim, a plaintiff must show: (1) that the defendant acted under color of state law; and (2) that, as a result of the defendant's actions, the plaintiff was deprived of rights or privileges secured by the Constitution and laws of the United States. Annis v. County of Westchester, 136 F.3d 239, 245 (2d Cir. 1998); Eagleston v. Guido, 41 F.3d 865, 872 (2d Cir. 1994).

### 3 Claims against Wright

#### 3.1 Wright Was Acting Under the Color of State Law

The parties dispute whether Wright acted under the color of state law.

State employees act under the color of state law when they act (1) in their official capacity "clothed with the authority of state law," or (2) "under 'pretense' of law" by purporting to act with official sanction. Sazon Inc. v. New York, No. 11-CV-3666, 2011 WL 5910171, at *4 (S.D.N.Y. Nov. 28, 2011) (quoting West v. Atkins, 487 U.S. 42, 49 (1988); Screws v. United States, 325 U.S. 91, 111 (1945)); accord Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 88 (2d Cir. Sept. 2, 2015). Even employees that "misuse[]" authority (for example, by exceeding it) act under the color of state law, so

long as they "carry a badge of authority of a State and represent it in some capacity."

Nat'l Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179, 191 (1988); accord Gleason v.

Scoppetta, 566 F. App'x 65, 69 (2d Cir. 2014); Sazon, 2011 WL 5910171, at *3. Only

purely private conduct and "acts of officers in the ambit of their personal pursuits" are

beyond Section 1983's reach. Monsky v. Moraghan, 127 F.3d 243, 245 (2d Cir. 1997).

Wright was acting under the color of state law when he ordered Plaintiff to move

to the rear and to leave the bus. On a public bus, the driver's commands are clothed with

state authority. At a minimum, Wright could act as if he had authority to eject Louis,

even if, in fact, he did not. See Nat'l Collegiate Athletic Ass'n, 488 U.S. at 191; see Griffin

v. Maryland, 378 U.S. 130, 135 (1964) ("If an individual is possessed of state authority

and purports to act under that authority, his action is state action."); Emanuele v. Town

of Greenville, 143 F. Supp. 2d 325, 331 (S.D.N.Y. 2001) ("One who lacks actual authority

nonetheless acts under color of state law if he purports to act according to official

power."). Accordingly, on the bus, Wright was acting under the color of state law.

After the police arrived, Wright continued to act under the color of state law.

There is evidence that after Plaintiff refused to leave, Wright obtained police assistance

to eject her. Louis told the officers that she was a victim and wanted to stay on the bus.

After hearing from Wright, however, the officers told Louis to leave because Wright was

uncomfortable with her. A jury could conclude that the officers carried out Wright's

wishes rather than their own, particularly in light of Martin's testimony that the driver

usually "determin[es]" whether passengers can remain on the bus, and that if a driver

were to refuse to continue with a particular passenger, she would have no "choice but to

ask [the passenger] to leave." Indeed, Martin essentially testified that, after exhausting

peacemaking efforts, officers defer to the driver's determination regarding the

passenger's status. This is unsurprising, given the driver's role. Because Wright's position allowed him to obtain police assistance to eject Louis, Wright acted under the color of state law.

Having found sufficient evidence that Wright acted under the color of state law, the Court turns to the substance of Plaintiff's claims.

## 3.2 First Amendment Claim

Plaintiff's brief is best construed as asserting a First Amendment retaliation claim. See Pl. Br. at 11 (arguing that "Defendant Wright removed Plaintiff from the bus because [sic] the fact that she exercised her First Amendment right to wear religious dress"); id. at 8–13.

Generally, "a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution." Friedl v. City of New York, 210 F.3d 79, 85 (2d Cir. 2000); see also Mozzochi v. Borden, 959 F.2d 1174, 1179 (2d Cir. 1992). "Although developed in the context of public employee speech, this principle also applies to private individuals who public officials punish for their speech." Smith v. Metro N. Commuter R.R., No. 98-CV-2528, 2000 WL 1449865, at *4 (S.D.N.Y. Sept. 29, 2000) (citations omitted). To prove retaliation, "a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by plaintiff's exercise of that right; and (3) the defendant's actions caused him some injury." Smith v. Campbell, 782 F.3d 93, 100 (2d Cir. 2015) (quotation omitted).

In this case, the first element—a protected right—is met. A Muslim woman's right to wear a burqa is generally protected by the First Amendment's free exercise and free speech clauses. Cf. Burgin v. Henderson, 536 F.2d 501 (2d Cir. 1976); Nicholas v.

<u>Tucker</u>, 89 F. Supp. 2d 475, 479 (S.D.N.Y. 2000) <u>aff'd</u>, 40 F. App'x 642 (2d Cir. 2002); <u>Lewis v. New York City Transit Auth.</u>, 12 F. Supp. 3d 418, 456 (E.D.N.Y. 2014); <u>accord</u> <u>Nichol v. ARIN Intermediate Unit 28</u>, 268 F. Supp. 2d 536, 557 (W.D. Pa. 2003).

The second element—retaliatory motive—requires "specific proof of defendants' improper motivation," which may include circumstantial or direct evidence. <u>Media Alliance, Inc. v. Mirch</u>, No. 09-CV-0659, 2011 WL 3328532, at *5 (N.D.N.Y. Aug. 2, 2011). A plaintiff must prove that the defendant acted with specific intent to punish the protected activity, but does not need to prove that the defendant knew that the activity is protected. <u>See</u> <u>Holley v. Cnty. of Orange, NY</u>, 625 F. Supp. 2d 131, 141 (S.D.N.Y. 2009) (holding that a defendant acted with retaliatory motive when he punished a plaintiff for engaging in protected speech, even though the defendant incorrectly believed the speech was an unprotected threat).

There is a genuine dispute regarding Wright's motive. Although Wright claims that Plaintiff was standing on the white line (which is prohibited), Plaintiff claims she was standing in the front passenger area. On the phone with his dispatcher, Wright did not mention the white line or say that Plaintiff caused him to order her to step back; he stated that he told Plaintiff to move to a seat or to the middle or back of the bus. Thus, there is a dispute regarding whether Wright had a legitimate reason to order Plaintiff to step back. Plaintiff also testified that Wright made unprovoked and disparaging remarks about her burqa, calling it or her "scary." Moreover, on the phone, Wright expressed discomfort with the burqa, although it should be noted that the call followed an argument and Wright was upset. Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that, without legitimate reason, Wright

ordered Plaintiff to leave the front passenger area, motivated by, or substantially because of, her burqa, and that when she refused, Wright ordered her off the bus.

There is sufficient evidence that Wright's actions injured Plaintiff. The parties' briefs focus on whether Plaintiff's right to religious exercise was chilled. But "[c]hilled speech is not the *sine qua non* of a First Amendment claim." Dorsett v. Cnty. of Nassau, 732 F.3d 157, 160 (2d Cir. 2013). Rather, Plaintiff may "show *either* that [her] speech has been adversely affected by the government retaliation or that [s]he has suffered some other concrete harm." Dorsett, 732 F.3d at 160 (citations omitted) (noting that a loss of a government contract, additional scrutiny at a border crossing, revocation of building permits, and refusal to enforce zoning laws are cognizable harms); see also Lozada v. Weilminster, 92 F. Supp. 3d 76 (E.D.N.Y. 2015).

Here, the concrete harm requirement is satisfied by evidence that Plaintiff was removed from the bus. Additionally, there is evidence that Plaintiff's exercise of her constitutional rights were chilled. Plaintiff testified that, as a result of Wright's conduct, she stopped riding the Q110 bus and moved to Philadelphia. This is sufficient "evidence that the plaintiff's behavior changed after the alleged retaliatory act." Abel v. Morabito, No. 04-CV-7284, 2009 WL 321007, at *4 (S.D.N.Y. Feb. 10, 2009) (citing Curley v. Vill. of Suffern, 268 F.3d 65, 73 (2d Cir. 2001)). The fact that Plaintiff continues to wear a burqa elsewhere does not preclude a finding of "actual chill." See Jones v. Bay Shore Union Free Sch. Dist., 947 F. Supp. 2d 270, 275 (E.D.N.Y. 2013) (finding a material question of fact as to whether plaintiff's First Amendment rights were actually chilled where he continued criticizing public officials but stopped using certain forums); Bartels v. Inc. Vill. of Lloyd, 751 F. Supp. 2d 387, 401 (E.D.N.Y. 2010).

Accordingly, Defendant Wright is not entitled to summary judgment on Plaintiff's First Amendment retaliation claim.

## 3.3 Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment prohibits state actors from engaging in "intentional discrimination on the basis of protected classifications," and certain selective treatment. Pinter v. City of New York, 976 F. Supp. 2d 539, 565 (S.D.N.Y. 2013); accord Savino v. Town of Southeast, 983 F. Supp. 2d 293, 301 (S.D.N.Y. 2013) aff'd, 572 F. App'x 15 (2d Cir. 2014); Rodriguez v. Clinton, No. 05-CV-322, 2009 WL 261203, at *7 (N.D.N.Y. Feb. 4, 2009) aff'd, 357 F. App'x 355 (2d Cir. 2009). Plaintiff asserts two equal protection theories: intentional discrimination and selective treatment.[13]

### 3.3.1 Intentional Discrimination Theory

As a member of a protected class, see Barnes v. Fedele, 760 F. Supp. 2d 296, 301 (W.D.N.Y. 2011) (citing Bizzarro v. Miranda, 394 F.3d 82, 86 (2d Cir. 2005)) ("Membership in a particular religious faith will generally satisfy the protected-class requirement."), Plaintiff can proceed on an intentional discrimination theory.

Actionable intentional discrimination includes, among other things, applying a neutral law or policy in an intentionally discriminatory way. Turkmen v. Hasty, 789 F.3d 218, 252 (2d Cir. 2015) (citing Brown v. City of Oneonta, 221 F.3d 329, 337 (2d Cir.

---

[13] Defendants argue that Plaintiff cannot proceed under a selective treatment theory because that theory was not mentioned in the amended complaint. MTA Reply Br. at 8. But a "complaint need not set out the correct legal theory on which the claim is based, so long as the complaint provides full notice of the circumstances giving rise to the plaintiff's claims." Morris v. Schroder Capital Mgmt. Int'l, 445 F.3d 525, 530 n.5 (2d Cir. 2006); see, e.g., Burwell v. Peyton, No. 12-CV-166, 2013 WL 1386290, at *4 n.3 (D. Vt. Apr. 4, 2013) (complaint not required to specify intentional discrimination theory).

2000)); see also Pyke v. Cuomo, 258 F.3d 107, 109 (2d Cir. 2001); Savino, 983 F. Supp.

2d at 301. Plaintiff argues that a neutral policy—the MTA's policy on controlling and

ejecting passengers—was discriminatorily applied. Cf. Raza v. City of New York, 998 F.

Supp. 2d 70, 78–81 (E.D.N.Y. 2013) (police investigatory authority); Burwell, 2013 WL

1386290, at *5 (police use-of-force rules).

To succeed, Plaintiff must proffer evidence that, when applying that policy,

Wright was "'motivated at least in part by a . . . discriminatory purpose.'" Doe v. Vill. of

Mamaroneck, 462 F. Supp. 2d 520, 546 (S.D.N.Y. 2006) (quoting United States v. City

of Yonkers, 96 F.3d 600, 612 (2d Cir. 1996)). To act with discriminatory purpose means

to "'select[] or reaffirm[] a particular course of action at least in part because of, not

merely in spite of, its adverse effects upon an identifiable group.'" United States v. City

of New York, 717 F.3d 72, 93–94 (2d Cir. 2013) (citations omitted). However, Plaintiff

does not need to prove that Wright was "'motivated solely, primarily, or even

predominantly by' improper concerns [such as] religion." Raza, 998 F. Supp. 2d at 79

(quoting City of Yonkers, 96 F.3d at 611). She need only show "that the alleged

'discrimination was a substantial or motivating factor' for the . . . action." Id. at 80. This

may be proved by circumstantial or direct evidence, including, for example, "the

historical background of the challenged decision, antecedent events, departures from

normal procedures, and contemporary statements by decisionmakers." Bloomingburg

Jewish Educ. Ctr. v. Vill. of Bloomingburg, N.Y., No. 14-CV-7250, 2015 WL 3604300, at

*19 (S.D.N.Y. June 9, 2015); accord Vill. of Arlington Heights v. Metro. Housing Dev.

Corp., 429 U.S. 252, 266–68 (1977).

In the context of claims against law enforcement officers, courts have held that

"where verbal statements are accompanied by an appreciable injury, an equal protection

claim may be cognizable." <u>Ali v. Connick</u>, No. 11-CV-5297, 2015 WL 5693677, at \*4

(E.D.N.Y. Sept. 28, 2015) (collecting cases); <u>see, e.g.</u>, <u>Cole v. Fischer</u>, 379 F. App'x 40, 43

(2d Cir. 2010). These courts held that "epithets may be regarded as direct evidence of . . .

animus and, when combined with . . . other unlawful actions, may establish an equal

protection violation." <u>Ali</u>, 2015 WL 5693677, at \*7.

Here, Plaintiff testified that Wright called her burqa "scary" and disparaged the

fact that she was fully covered. Defendants deny that these comments addressed

religion, citing testimony that Wright did not know that Plaintiff was a Muslim. This is a

credibility determination that must be left to a jury. <u>See</u> <u>Floyd v. City of New York</u>, 959

F. Supp. 2d 540, 571 (S.D.N.Y. 2013), <u>appeal dismissed</u> (Sept. 25, 2013) (citations and

quotation omitted) ("Because discriminatory intent is rarely susceptible to direct proof,

[courts consider] such circumstantial and direct evidence of intent as may be

available."). For example, although Wright testified that a burqa is not necessarily

evidence of religion because "some [people] just wear the clothes because they want to

wear the clothes," he admitted that he knows that Muslims (and Hindus) wear burqas or

similar garb. Dep. at 114–15. Moreover, as noted above, there is evidence that Wright

ordered Louis to the rear of the bus without a legitimate reason. That action, combined

with Wright's comments and testimony about the burqa, could lead a reasonable jury to

conclude that Wright acted with discriminatory intent.

Moreover, ejection from a public bus is an appreciable injury. <u>Cf.</u> <u>Adickes v. S. H.</u>

<u>Kress & Co.</u>, 398 U.S. 144, 171 (1970) (denial of service); <u>Tabbaa v. Chertoff</u>, 509 F.3d

89, 102 (2d Cir. 2007) (additional border scrutiny).

Therefore, Wright is not entitled to summary judgment on the equal protection

claim based on a theory of intentional discrimination.

### 3.3.2 Selective Treatment Theory

Plaintiff also asserts a theory of selective treatment, which requires proof that "(1) [plaintiff] was treated differently from other similarly-situated individuals; and (2) the differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure." Skehan v. Vill. of Mamaroneck, 465 F.3d 96, 110 (2d Cir. 2006) overruled in part on other grounds by, Appel v. Spiridon, 531 F.3d 138 (2d Cir. 2008) (quotation omitted); see also LeClair v. Saunders, 627 F.2d 606, 609–610 (2d Cir. 1980); Savino, 983 F. Supp. 2d at 301.

District courts in the Second Circuit "are split regarding the definition of 'similarly situated.'" Epstein v. Cnty. of Suffolk, No. 14-CV-0937, 2015 WL 5038344, at *10 (E.D.N.Y. Aug. 26, 2015). The more stringent standard requires proof that no rational person could regard the plaintiff and comparator as different enough to justify differential treatment "on the basis of a legitimate government policy," and that there is no possibility that the defendant acted "on the basis of a mistake." Id. (quotations omitted). The less stringent standard requires proof "that plaintiff and comparators were similarly situated in all material respects," or that a reasonable person would find them "roughly equivalent." Id. (collecting cases).

Even under the less stringent standard, Plaintiff has not proffered evidence of similarly situated individuals. Because the incident began when Wright told Plaintiff to leave the front passenger area, Wright's actions cannot be separated from the fact that Plaintiff was standing near him. Thus, Plaintiff was similarly situated to passengers standing in the front passenger area. She has not identified those passengers, if any; therefore, her selective treatment theory fails.

### 3.4  Fourth Amendment Claim

Plaintiff argues that her Fourth Amendment right against unreasonable seizures was violated when she "was removed by Defendant Wright through his employment of police power through communication with the police officers." Pl. Br. at 18.

This claim is rejected because undisputed evidence shows that there was no Fourth Amendment seizure. In the Second Circuit, "a police order to leave an area, without more, does not effect a seizure of the person so ordered." Salmon v. Blesser, 802 F.3d 249 (2d Cir. 2015). As the Court of Appeals recently explained:

> Police officers frequently order persons to leave public areas: crime scenes, accident sites, dangerous construction venues, anticipated flood or fire paths, parade routes, areas of public disorder, etc. A person may feel obliged to obey such an order. Indeed, police may take a person by the elbow or employ comparable guiding force short of actual restraint to ensure obedience with a departure order. Our precedent does not view such police conduct, without more, as a seizure under the Fourth Amendment as long as the person is otherwise free to go where he wishes. That is the crux of Sheppard v. Beerman, which concluded that a person who is ordered to leave a judge's chambers and then escorted out of the courthouse has not been seized because the person remains free to go anywhere else that he wishes.

Id. (citing Sheppard v. Beerman, 18 F.3d 147, 153 (2d. Cir. 1994)); see also Richardson v. Merritt, No. 12-CV-5753, 2014 WL 2566904, at *5 n.2 (E.D.N.Y. June 6, 2014). Although Plaintiff was ejected from the bus, she was "free to go anywhere else," Sheppard, 18 F.3d at 153, and Defendants did not restrain her. Therefore, there was no seizure. See id.; Salmon, 2015 WL 5254851, at *1. Accordingly, Defendants are entitled to summary judgment on the Fourth Amendment claim.

### 3.5  Procedural Due Process Claim

To assess Plaintiff's claim that Defendants violated her procedural due process rights, initially the Court must determine whether Plaintiff has a property or liberty

interest that is protected by the Constitution. "A property right will not be recognized as cognizable under the due process doctrine if the person claiming the right has a mere abstract need or desire for, or unilateral expectation of, the claimed right. Rather, the person claiming the right must have a 'legitimate claim of entitlement.'" DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 130 (2d Cir. 1998) (quoting Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972)). A claim of entitlement is defined by reference to "existing rules or understandings that stem from an independent source such as state law." Bd. of Regents, 408 U.S. at 577. If Plaintiff has a property or liberty interest, the Court must determine whether the defendant deprived the plaintiff of that interest without due process. See Bryant v. N.Y. State Educ. Dep't, 692 F.3d 202, 218 (2d Cir. 2012).

Plaintiff's procedural due process claim is largely duplicative of other claims; Plaintiff argues that she was deprived of Fourth Amendment rights and "of her liberty by being forcibly removed from the MTA Bus by Defendant Wright for expressing her First Amendment rights" and based on "discriminat[ion]." Pl. Br. at 15.

Plaintiff asserts two additional interests. First, Plaintiff asserts that passengers have a right to speak with an MTA supervisor before being ejected from a bus. Plaintiff does not, however, identify the source of this purported right. Pl. Br. at 15.

Second, Plaintiff asserts an interest in an accurate record of the incident and argues that she was deprived of that interest when Wright submitted an incomplete report to the MTA, allegedly in violation of MTA procedures. Id. at 15, 17. But Plaintiff does not argue that those procedures (in the MTA's Student Bus Operator Training Program Manual) create a property interest for passengers or anyone else. See generally Sealed v. Sealed, 332 F.3d 51, 57 (2d Cir. 2003) (citing Olim v. Wakinekona, 461 U.S.

238, 250–51 (1983); <u>Hewitt v. Helms</u>, 459 U.S. 460, 471 (1983)) (noting that "*procedures*, standing alone, create no independent *substantive* entitlements, whose deprivation might trigger application of the Due Process Clause").

Because Plaintiff has not identified a property interest, Defendants are entitled to summary judgment on the procedural due process claim.

## 3.6 Substantive Due Process Claim

Plaintiff's substantive due process claim is based on the theory that Plaintiff was ejected from Wright's bus in retaliation for her exercise of religion and speech, and Wright's "purposeful[] failure to follow" MTA "rules and regulations." Pl. Br. at 16–17. This claim is duplicative of Plaintiff's retaliation and equal protection claims and therefore dismissed. <u>See</u> <u>Albright v. Oliver</u>, 510 U.S. 266 (1994); <u>Costello v. Town of Huntington</u>, No. 14-CV-2061, 2015 WL 1396448, at *11 (E.D.N.Y. Mar. 25, 2015).

## 4 <u>Claims against the MTA</u>

The fact that Wright may be subject to liability under Section 1983 does not necessarily mean that the MTA is also subject to liability. A public body can be held liable under Section 1983 only if it "itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." <u>Connick v. Thompson</u>, 563 U.S. 51, 131 S.Ct. 1350, 1359 (2011); <u>see</u> <u>Monell v. Dep't of Social Services</u>, 436 U.S. 658, 694 (1978); <u>Jones v. Town of East Haven</u>, 691 F.3d 72, 80 (2d Cir. 2012). "[L]ocal governments are responsible only for their *own* legal acts." <u>Connick</u>, 131 S.Ct. 1350, 1359 (quotation omitted). "They are not vicariously liable under § 1983 for their employees' actions." <u>Id.</u> Thus, to hold the MTA liable, Plaintiff "must prove that 'action pursuant to official municipal policy' caused [her] injury." <u>Id.</u> (quoting <u>Monell</u>, 436 U.S. at 691).

Plaintiff asserts a failure-to-train theory of municipal liability. A public agency's failure to train its employees about their "duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." Id. "[A]t the summary judgment stage, plaintiffs must 'identify a specific deficiency in the . . . training program and establish that that deficiency is closely related to [and actually caused] the ultimate injury.'" Jenkins v. City of New York, 478 F.3d 76, 94 (2d Cir. 2007) (quoting Green v. City of New York, 465 F.3d 65, 81 (2d Cir. 2006)); see also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 404 (1997); Cash v. Cnty. of Erie, 654 F.3d 324, 342 (2d Cir. 2011). Additionally, plaintiffs must show that the municipality's failure amounts to "deliberate indifference" to the rights that were violated. Connick, 131 S.Ct. at 1359. This requires "proof that a municipal actor disregarded a known or obvious consequence of his action." Id. at 1360.

Plaintiff's failure-to-train theory cannot survive because Plaintiff has not "identif[ied] a specific deficiency in the [MTA's] training program" or advanced a "theory as to how a training deficiency caused" the constitutional violation. Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 129 (2d Cir. 2004) (citing City of Canton, Ohio v. Harris, 489 U.S. 378, 391 (1989)).[14] Without that evidence, "[i]t is impossible to prevail on a claim that the . . . training program was inadequate" Id. at 130; see also Farrow v. City of Syracuse, No. 5:12-CV-1401, 2014 WL 1311903, at *8 (N.D.N.Y. Mar. 31, 2014) ("Plaintiff has not adduced direct evidence of the City's training policies in discovery and, therefore, his claim cannot survive summary judgment.").

---

[14] Plaintiff's failure-to-train theory is based entirely on prior incidents of discrimination involving a different bus operator, the New York City Transit Authority (NYCTA), and the fact that *after* the May 26, 2012 incident, the MTA did not discipline Wright or subject him to additional training. See Pl. Br. at 4–6.

Because there is no basis for municipal liability, the MTA is entitled to summary judgment on all claims.

## 5   Claims against the City Defendants

Although Plaintiff has not opposed the City Defendants' motion for summary judgment, the Court has examined their submission and determined that they have met their burden of demonstrating that no material issue of fact remains for trial.

The First and Fourteen Amendment claims that survive against Wright do not state a claim against Martin because a defendant's personal involvement in alleged constitutional deprivations is a prerequisite to liability under Section 1983. See Bastuk v. Cnty. of Monroe, No. 13-CV-4784, 2015 WL 5805655, at *2 (2d Cir. Oct. 6, 2015); Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 122 (2d Cir. 2004). Martin was not involved in ordering Plaintiff to leave the front passenger area, nor was she ever motivated by an improper purpose. Martin simply responded to a 911 call and learned that Plaintiff was involved in two disputes, including a physical altercation with other passengers, and that Wright did not feel safe continuing to drive with her. Although Plaintiff told Martin that she was the victim of discrimination, a police officer in this situation is not required to investigate that claim or to force Wright to continue driving. It is clear that Martin was motivated by her responsibility to maintain order, not by Plaintiff's religion. Accordingly, there is no claim against Martin; and, even if there were, she would be protected by qualified immunity because her actions were objectively reasonable. See generally Jenkins v. City of New York, 478 F.3d 76, 87 (2d Cir. 2007).

Because there was no underlying constitutional violation, the City is not liable under Section 1983. See Mendoza v. Cnty. of Nassau, No. 11-CV-2487, 2012 WL 4490539, at *7 (E.D.N.Y. Sept. 27, 2012) (citing Segal v. City of New York, 459 F.3d 207,

219 (2d Cir. 2006)) ("When there is no underlying constitutional violation, there can be no municipal liability under <u>Monell</u>.").

Therefore, the City Defendants are entitled to summary judgment on all claims.

**CONCLUSION**

For the foregoing reasons, the City Defendants' motion for summary judgment is GRANTED. The MTA Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

SO ORDERED.


Dated:      Brooklyn, New York
            November 6, 2015


_____/s/_____
I. Leo Glasser
Senior United States District Judge